IN THE
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

TOMMY RAY MAYS II and QUINTON NELSON SR.,
*Individually and on behalf of all others similarly situated*,

*Plaintiffs-Appellees,*

v.

FRANK LaROSE, *in his official capacity as Secretary of State*,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Southern District of Ohio, Case No. 2:18-cv-1376

## BRIEF OF APPELLEES MAYS AND NELSON

Naila S. Awan
Kathryn C. Sadasivan
DĒMOS
80 Broad St., 4th Fl.
New York, NY 10004
(212) 485-6065
nawan@demos.org

Mark P. Gaber
Danielle M. Lang
Jonathan M. Diaz
Dana Paikowsky
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Ste. 400
Washington, DC 20005
(202) 736-2200
mgaber@campaignlegal.org

Chiraag Bains
DĒMOS
740 6th St. NW, 2nd Fl.
Washington, DC 20001
(202) 864-2746
cbains@demos.org

Jonathan Manes
RODERICK AND SOLANGE
   MACARTHUR JUSTICE CENTER
160 E. Grand Ave., 6th Fl.
Chicago, IL 60611
(312) 503-0012
jonathan.manes@law.northwestern.edu

*Counsel for Plaintiffs-Appellees*

## CORPORATE DISCLOSURE

Pursuant to Federal Rule of Appellate Procedure and Sixth Circuit Rule 26.1, counsel for Appellees certify that no party to this appeal is a subsidiary or affiliate of a publicly owned corporation and no publicly owned corporation that is not a party to this appeal has a financial interest in the outcome. Appellees are two individuals who represent a class of those similarly situated.

/s/ Mark P. Gaber
Mark P. Gaber

*Counsel for Appellees*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE ........................................................... i

TABLE OF CONTENTS...................................................................... ii

TABLE OF AUTHORITIES .............................................................. iv

STATEMENT IN SUPPORT OF ORAL ARGUMENT ..................................... vii

STATEMENT OF ISSUES ...................................................................1

INTRODUCTION .............................................................................2

STATEMENT OF THE CASE.............................................................4

SUMMARY OF ARGUMENT ...........................................................16

ARGUMENT ...................................................................................18

   I.  Standard of Review........................................................................18

   II.  The District Court Correctly Concluded, Based Upon the Undisputed Record Evidence, that Ohio's Disparate Treatment of Jail-Confined and Hospital-Confined Voters Violates Equal Protection. ...................................19

      A.  Ohio's Denial of Absentee Voting in the Days Proceeding Election Day Imposes a Severe Burden As-Applied to Late-Jailed Voters. .........24

      B.  The District Court Correctly Concluded, Based on the Undisputed Record Evidence, that Election Administration Concerns Do Not Justify Denying Late-Jailed Voters Access to the Ballot........................29

      C.  The District Court Correctly Concluded that Late-Jailed and Late-Hospitalized Voters Are Similarly Situated. ...........................................36

         1.  The Record Does Not Support the Secretary's Accessibility Argument...........................................................................................38

         2.  The Record Does Not Support the Secretary's Security Argument. .41

         3.  The Record Does Not Support the Secretary's Transience Concerns....................................................................................44

      D.  The District Court Correctly Concluded that the Differing Treatment of Late-Jailed Voters Is Unconstitutional................................................46

   III.  The District Court Did Not Abuse its Discretion by Certifying a Class. .......49

      A.  The District Court Did Not Abuse its Discretion by Concluding that Plaintiffs Satisfied the Commonality and Typicality Requirements.......50

    B.  The District Court's Rejection of the Secretary's Ascertainability
         Objection Was Not an Abuse of Discretion. ........................................... 53

CONCLUSION ...................................................................................................... 55

CERTIFICATE OF COMPLIANCE ..................................................................... 57

CERTIFICATE OF SERVICE ............................................................................... 58

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS .............. 59

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)................................. 18

*Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A.*,
    12 F.3d 1382 (6th Cir. 1993................................................................. 38

*Beattie v. CenturyTel, Inc.*, 511 F.3d 554 (6th Cir. 2007) ........................... 49

*Bell v. Wolfish*, 441 U.S. 520 (1979) ............................................................ 27

*Burdick v. Takushi*, 504 U.S. 428 (1992)...................................................... 20

*Carrington v. Rash*, 380 U.S. 89 (1965).................................................. 21, 29

*Citizens for Legislative Choice v. Miller*,
    144 F.3d 916 (6th Cir. 1998) ................................................................. 29

*Cole v. City of Memphis*, 839 F.3d 530 (6th Cir. 2016) .............................. 53

*Consumer Financial Protection Bureau v. Borders & Borders, PLC*, No.
    3:13-CV-1047-CRS, 2016 WL 9460471
     (W.D. Ky. June 29, 2016)................................................................ 30, 31

*Crawford v. Marion County Election Board*,
    553 U.S. 181 (2008) (plurality opinion)........................................... 20, 29

*Davis v. Cintas Corp.*, 717 F.3d 476 (6th Cir. 2013) ................................... 49

*DeShaney v. Winnebago County Department of Social Services*,
    489 U.S. 189 (1989).............................................................................. 27

*Ecclesiastes 9:10-11-12, Inc. v. LMC Holding Co.*,
    497 F.3d 1135 (10th Cir. 2007) ............................................................ 30

*Fair Elections Ohio v. Husted*, 770 F.3d 456 (6th Cir. 2014) ................ 11, 24

*Fitzgerald v. Racing Ass'n*, 539 U.S. 103 (2003)................................... 36, 37

*Frank v. Walker*, 819 F.3d 384 (7th Cir. 2016) ........................................... 25

*Franklin v. Kellogg Co.*, 619 F.3d 604 (6th Cir. 2010) ............................... 18

*Harper v. Virginia State Board of Elections*,
    383 U.S. 663 (1966)......................................................................... 19, 37

*In re Whirlpool Corp. Front-Loading Washer Product Liability Litigation*,
    722 F.3d 838 (6th Cir. 2013) ................................................................ 49

*Lawrence v. Blackwell*, 430 F.3d 368 (6th Cir. 2005)................................. 33

*League of Women Voters of Ohio v. Brunner,*
   548 F.3d 463 (6th Cir. 2008) ................................................................ 19

*Libertarian Party of Kentucky v. Grimes,*
   835 F.3d 570 (6th Cir. 2016) ......................................................... 28, 29

*Libertarian Party of Ohio v. Blackwell,*
   462 F.3d 579 (6th Cir. 2006) ................................................................ 19

*Loesel v. City of Frankenmuth,* 692 F.3d 452 (6th Cir. 2012) ............... 36, 49

*McDonald v. Board of Election Commissioners of Chicago,*
   394 U.S. 802 (1969) ............................................................................... 19

*McPherson v. Kelsey,* 125 F.3d 989 (6th Cir. 1997) ................................... 47

*Moore v. Philip Morris Companies, Inc.,*
   8 F.3d 335 (6th Cir. 1993) .................................................................... 38

*Nordlinger v. Hahn,* 505 U.S. 1 (1992) ............................................... 36, 37

*Northeast Ohio Coalition for the Homeless v. Husted,*
   698 F.3d 580 (6th Cir. 2012) ................................................................ 20

*Northeast Ohio Coalition for the Homeless v. Husted,*
   837 F.3d 612 (6th Cir. 2016) ................................................................ 33

*O'Brien v. Skinner,* 414 U.S. 524 (1974) ............................................. 26, 47

*Obama for America v. Husted,* 697 F.3d 423 (6th Cir. 2012) .............. *passim*

*Pina v. Children's Place,* 740 F.3d 785 (1st Cir. 2014) ............................. 43

*Pipefitters Local 636 Insurance Fund v. Blue Cross Blue Shield of Michigan,*
   654 F.3d 618 (6th Cir. 2011) ................................................................ 49

*Powers v. Hamilton County Public Defender Commission,*
   501 F.3d 592 (6th Cir. 2007) ................................................................ 54

*Prime Media, Inc. v. City of Brentwood, Tenn.,*
   398 F.3d 814 (6th Cir. 2005) ................................................................ 12

*Reilly v. NatWest Markets Group, Inc.,*
   181 F.3d 253 (2d Cir. 1999) ................................................................. 30

*Robinson v. Jackson,* 615 Fed. Appx. 310 (6th Cir. 2015) ......................... 27

*Sprague v. General Motors Corp.,*
   133 F.3d 388 (6th Cir. 1998) ................................................................ 50

*Turner v. Safley,* 482 U.S. 78 (1987) ......................................................... 27

*United States v. Batista*, 558 Fed. App'x 874 (11th Cir. 2014)............... 47-48

*United States v. Virginia*, 518 U.S. 515 (1996) ............................................ 31

*Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016)........................................... 28

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ................................. 50

*Weathers v. Peters Realty Corp.*, 499 F.2d 1197 (6th Cir. 1974)................. 50

*White v. Baxter Healthcare Corp.*,
    533 F.3d 381 (6th Cir. 2008) ................................................................. 18

*Young v. Nationwide Mutual Insurance Co.*,
    693 F.3d 532 (6th Cir. 2012) ................................................................. 54

*Youngberg v. Romeo*, 457 U.S. 307 (1982) ................................................. 27

**Statutes**

Ohio Rev. Code § 3509.01............................................................................ 4

Ohio Rev. Code § 3509.03............................................................................ 2

Ohio Rev. Code § 3509.08............................................... 2, 3, 4, 5, 45, 54

Ohio Rev. Code § 3599.06.......................................................................... 47

**Rules**

Fed. R. Civ. P. 23 ....................................................... 1, 15, 17, 49

Fed. R. Civ. P. 56 .................................................................. 12, 18

**Other Authorities**

Ben Sutherly, *Hospital Access, Security Is a Real Balancing Act*,
    The Columbus Dispatch (Aug. 13, 2012)................................................ 44

Ohio Secretary of State, 2018 Official Election Results,
    https://www.sos.state.oh.us/elections/election-results-and-data
    /2018-official-elections-results/ ............................................................. 28

U.S. Census Bureau, *Ohio Annual Estimates of Resident Population*,
    https://factfinder.census.gov/faces/tableservices/jsf/pages/
    productview.xhtml?src=bkmk (last visited Jan. 31, 2020)........................ 6

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a), Plaintiffs-Appellees respectfully request oral argument. This Court's decision will determine whether certain eligible, confined Ohio voters will be able to exercise their fundamental right to vote in the March 17, 2020 primary and in future elections. The Court has scheduled oral argument for February 13, 2020.

**STATEMENT OF ISSUES**

1.      Did the district court correctly conclude that Ohio violates the Equal Protection Clause by withholding from one class of confined voters (late-jailed voters) access to absentee ballots that it provides to another class of confined voters (late-hospitalized voters), given the undisputed record evidence that the two groups are similarly situated in all relevant respects?

2.      Did the district court abuse its discretion in certifying a class pursuant to Fed. R. Civ. P. 23(b)(2)?

**INTRODUCTION**

Every election, approximately 1,000 eligible, registered Ohio voters are denied their fundamental right to vote because they are arrested and confined in jail in the last days before an election. Many are confined merely because they cannot afford to post bail. These voters have been found guilty of no crime and remain eligible to vote. The absolute denial of the vote to these jail-confined voters—while Ohio extends an absentee ballot request process to similarly situated hospital-confined voters that it could easy extend to jail-confined voters—violates the Equal Protection Clause.

Section 3509.08 of the Ohio Revised Code ("Ohio's confined voter statute") defines two groups of "confined voters": those who are in a (1) hospital (or whose minor children are);[1] or (2) jail. Ohio Rev. Code § 3509.08. These voters face often insurmountable obstacles to voting at the polls and are confined in a limited number of identifiable locations. For that reason, Ohio not only sends ballots to hospitals and jails, it dispatches officials to deliver ballots there as well. *Id.* While both hospital- and jail-confined voters can request and cast a ballot if they submit their request before the general absentee ballot request deadline (noon on the Saturday before an election), *id.* §§ 3509.03(D), 3509.08(A), Ohio's confined voter statute allows only

---

[1] For simplicity, this brief will refer to this collective group as "hospital-confined voters."

one of these groups to request and receive an absentee ballot after this deadline, *id.* § 3509.08(B). Voters who are unexpectedly hospitalized and therefore unable to vote in-person ("late-hospitalized voters") can request ballots until 3 p.m. on Election Day. *Id.* Voters who are unexpectedly jailed and detained in the days before Election Day ("late-jailed voters") cannot. State law denies them any way to receive, or cast a ballot.

There is no permissible reason that these two groups of confined voters are subject to unequal treatment. The evidence below showed Ohio has the infrastructure in place to deliver ballots to confined voters, both late-hospitalized and late-jailed voters, through Election Day, and the Secretary provided no contrary evidence. Indeed, the Secretary asks this Court to rule for him *as a matter of law* based on factual theories about the differences between late-hospitalized and late-jailed voters that lack any support in the record and that would be improper for this Court to consider. The Secretary asserts that providing equal access to late-jailed voters would upend election administration, but record evidence demonstrates it would not; to the contrary, providing ballots to jail-confined voters has been *less* burdensome than serving hospital-confined voters. Removing the Secretary's unsupported assertions, Ohio's interest boils down to a constitutionally insufficient desire to avoid a "relatively small, solely pecuniary, burden" associated with serving both groups of voters equally. Stay Order, R.80, PageID#4371.

The certain disenfranchisement of late-jailed voters is well-established and predictable. There is no dispute that Ohio arrests and detains eligible voters in the days preceding each election, and then denies these voters any means to cast a ballot while extending that right to the other class of confined voters. The question here is not whether disenfranchisement will occur, but whether the Constitution permits it. It does not.

The district court's judgment should be affirmed.

## STATEMENT OF THE CASE

### *Ohio's Confined Voter Laws and Process*

Ohio law recognizes that hospital- and jail-confined voters face unique burdens in casting ballots not faced by other voters. For that reason, Ohio has created a process, distinct from the general absentee system, under which hospital- and jail-confined voters can have ballots delivered to them—through on-site visits by board of elections ("BOE") employees. *Compare* Ohio Rev. Code § 3509.01, *with id.* § 3509.08.

To take advantage of this process, jail-confined voters must submit absentee ballot requests before the general request deadline. *Id.* § 3509.08(A). If voters are arrested after that deadline, there is no mechanism for them to vote. Seskes Deposition, R.55-4, PageID#2180. Late-hospitalized voters, on the other hand, can

request absentee ballots until 3:00 p.m. on Election Day. Ohio Rev. Code § 3509.08(B).

Ohio's confined voter statute requires that BOEs work with both jails and hospitals to ensure confined voters can receive and cast ballots. When a voter is "confined to a public or private institution within the county," BOEs are required to "designate two board employees belonging to the two major political parties for the purpose of delivering the ballot to the disabled or confined elector and returning it to the board." *Id.* § 3509.08(A). When a voter is confined outside of the county, BOEs may follow this same procedure or mail the absent voter's ballot "directly to the applicant at the applicant's voting residence or place of confinement." *Id.*

It is substantially *more* difficult for BOEs to conduct voting at hospitals than at jails. First, county BOEs are often required to serve many hospitals, but only one or two jails. *See, e.g.*, Poland Deposition, R.55-16, PageID#2465, 2471 (Hamilton County serves only two jail facilities but "various hospitals"); Royer Deposition, R.55-7, PageID#2288, 2296 (Franklin County serves 10 to 12 hospitals and only two jails); Smith Deposition, R.55-15, PageID#2435, 2441-42 (Butler County serves over five hospitals and only two jails).

Second, hospital voting is less orderly and more burdensome for BOE officials than jail voting. For example, Shirley Royer manages the jail-confined

voting process for Franklin County, Ohio's most populous,[2] and is part of the team that delivers ballots to hospital-confined voters. Royer Deposition, R.55-7, PageID#2280, 2286. She testified that it could take as many as twenty-four trips back-and-forth from hospitals to serve late-hospitalized voters. *Id.*, PageID#2296. When she arrives at the hospital, she must locate the voters, who will be "on every floor" of the facility. *Id.*, PageID#2289. Likewise, the director of the Hamilton County BOE (which encompasses Cincinnati) testified that election officials may have to wait "[i]f the voter's in testing [or] something like that" when they arrive at the hospital. Poland Deposition, R.55-16, PageID#2471; *see also* Kelly Deposition, R.55-24, PageID#2616 ("I've heard horror stories [about hospital voting].").

The same is not true for jails. Jail officials testified that they coordinate with the BOE to schedule voting and escort voters to the BOE officials. Opinion, R.70, PageID#4326; *see also* Royer Deposition, R.55-7, PageID#2289 (Ms. Royer noting that "[w]hen [she] go[es] to the jail, everyone is brought to one room for [her]"). For these reasons, Ms. Royer noted that it takes "substantially less . . . work and time" to deliver ballots to jail-confined voters than hospital-confined voters. Royer Deposition, R.55-7, PageID#2289. Likewise, while testimony showed that Hamilton County BOE officials have been unable to locate hospitalized voters in the past,

---

[2] *See* U.S. Census Bureau, Ohio Annual Estimates of Resident Population, https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src= bkmk (last visited Jan. 28, 2020).

Poland Deposition, R.55-16, PageID#2476, they have not experienced similar difficulties in the jail context, *id.*, PageID#2466; *see also* Saxon Deposition, R.55-22, PageID#2549-50 (testifying that Franklin County has never had difficulty locating a jail-confined voter).

Given the volume of hospitals and the difficulty of locating patients in hospitals, it is unsurprising that election officials spend much more time helping hospital-confined voters than jail-confined voters. *See, e.g.*, Royer Deposition, R.55-7, PageID#2282, 2299 (testifying that voting for jail-confined voters takes "about an hour maybe, hour and 15 minutes" from start to finish but "with respect to the hospitals, [they] go from 5 p.m. until sometimes 4 a.m.," totaling up to eleven hours); Kelly Deposition, R.55-24, PageID#2616 (testifying that hospital voting can last into "the wee hours of the morning").

Notwithstanding the challenges posed by hospital voting, Ohio BOEs have consistently been able to serve late-hospitalized voters on Election Day. *See* Seskes Deposition, R.55-4, PageID#2186; Poland Deposition, R.55-16, PageID#2472; Royer Deposition, R.55-7, PageID#2289 (testifying that it is " probably not a burden" to offer hospital voting). BOEs can quickly print unique ballots for hospital-confined voters based upon their precinct. Poland Deposition, R.55-16, PageID#2476; Smith Deposition, R.55-15, PageID#2452; Royer Deposition, R.55-

7, PageID#2295-96 (noting that the Board is able to have all hospital ballots printed and ready for delivery within two hours of the 3 P.M. deadline on Election Day).

Ms. Royer's testimony, based on her experience in Ohio's most populous county, made clear that offering late-jailed voters the same opportunity to cast absentee ballots as late-hospitalized voters would pose no significant burden. She testified that (1) the Board would simply shift the day when it delivers absentee ballots to the jail from the day before an election to Election Day, Royer Deposition, R.55-7, PageID#2299, (2) she was not aware of "anything about the jails as opposed to the hospitals, that would make it such that there would be a reason the board would not be able to, on election day, after 3 p.m., receive the applications, determine the eligibility and print the ballot to deliver to the jail," *id.*, PageID#2297, (3) the BOE would not need to increase the number of trips staff made to the jail, *id.*, PageID#2297, and (4) the same two staff members who currently deliver ballots would continue to do so, *id.*, PageID#2299; *see also* Poland Deposition, R.55-16, PageID#2469-70 (noting that it may require additional temporary staff if emergency hospital voting were extended to late-jailed voters).

Moreover, there is no evidence that security or contraband concerns have ever interfered with election officials' ability to undertake this work. Saxon Deposition, R.55-22, PageID#2550 (testifying that there has never been a security incident during voting at the Franklin County Jail).

The Secretary's designated representative, testifying at a 30(b)(6) deposition, could not articulate any rationale for treating late-jailed and late-hospitalized voters differently. Seskes Deposition, R.55-4, PageID#2183 (Q: "And do you know what the rationale is for treating unforeseeably hospitalized voters different that unforeseeably jailed voters?" . . . A: "No." Q: "Can you think of a rationale for treating unforeseeably hospitalized voters differently than unforeseeably jailed voters?" . . . A: It would be complete speculation. I'm not a legislator."). Thus, the Secretary's designated representative was unaware of any of the *post hoc* policy rationales provided by the Secretary in his brief to this Court.

### *Plaintiffs' 2018 Arrest and Detention Through Election Day*

Tommy Ray Mays, II and Quinton Nelson, Sr., the named Plaintiff-Appellees, were arrested shortly before Election Day 2018. Both men had planned to vote in-person on Election Day in Montgomery County, where they were registered. Mays Declaration, R.3-1, PageID#123; Nelson Declaration, R.3-2, PageID#124. Both men qualified for public defenders and were held on $10,000 bail, awaiting court dates scheduled after Election Day. TRO Hearing Transcript, R.20, PageID#174.

Because of the time of their arrests, neither Mr. Mays nor Mr. Nelson could take advantage of Ohio's confined voter statute. Mr. Mays was arrested on a misdemeanor charge at 7:05 p.m. on Saturday, November 3, after the general request deadline had passed. Diaz Declaration, R.3-3, PageID#126. Mr. Mays asked jail

officials if he would be able to vote and never received a clear response. Mays Deposition, R.55-9, PageID#2319, 2321-22; 2330. Moreover, he received no information about who to contact to try to vote, did not have access to the internet, did not possess a calling card necessary for phone access, and was not eligible to receive visitors for the first few days of his incarceration. *Id.*, PageID#2329-30.

Mr. Nelson—whose charges were later dismissed—was arrested at 10:08 p.m. on Friday, November 2, but was not fully booked into the jail until early Saturday morning. Nelson Deposition, R.55-10, PageID#2356-57. Although Mr. Nelson was technically detained pre-deadline (albeit only by hours), he did not have access to commissary—necessary for phone cards, stamps, and envelopes—until well after the deadline had passed. *Id.*, PageID#2359. The jail had no phonebook, no information about how to contact the BOE, and did not allow physical contact with visitors, foreclosing his ability to apply for a ballot. *Id.*, PageID#2363-64. The undisputed record evidence establishes Mr. Nelson had no means to request an absentee ballot by noon Saturday.

### *District Court Proceedings*

Facing certain disenfranchisement, Mr. Mays and Mr. Nelson filed suit on November 6, 2018—the day of the general election. Complaint, R.1, PageID#11. They made two claims: that denying them emergency absentee ballots when the state provides them to similarly situated late-hospitalized violated the Equal Protection

Clause of the Fourteenth Amendment, and that their inability to vote under Ohio law

constituted an undue burden in violation of the First and Fourteenth Amendments.

That same day, they sought a temporary restraining order ("TRO"), Emergency TRO

Motion, R.3, PageID#105-06, and sought to represent a class of:

> All individuals arrested and held in detention in Ohio on or after close of
> business for the county election board on the Friday prior to the Election who
> (1) are eligible to vote in Ohio and are registered to do so, (2) did not vote
> absentee in person or by mail prior to their detention, (3) were provided
> neither an absentee ballot nor transportation to a voting center nor access to
> any other method of voting while held in detention, and (4) will remain in
> detention through close of polls on Election Day.

Class Certification Motion, R.2-2, PageID#31.[3]

The district court held a hearing and determined that the "failure to grant the

requested relief would amount to the denial of Named Plaintiffs' right to vote." TRO

Order, R.12, PageID#153. The court ordered the Secretary to direct the Montgomery

County BOE to deliver ballots to Mr. Mays and Mr. Nelson at the jail. *Id.*,

PageID#153; TRO Hearing Transcript, R.20, PageID#174. Election officials

testified that the process did "not [take] very long at all." Cavender Deposition, R.55-

12, PageID#2410.

Following the TRO ruling, the parties engaged in extensive discovery,

conducting fourteen depositions, producing thousands of pages of documents, and

---

[3] In 2014, this Court ruled that only affected voters, not organizations, had standing
to raise this challenge. *Fair Elections Ohio v. Husted*, 770 F.3d 456, 459 (6th Cir.
2014).

serving answers to interrogatories and requests for admission before fully briefing cross-motions for summary judgment and Plaintiffs' class certification motion.

On November 6, 2019, the district court granted Plaintiffs' motion for summary judgment and denied the Secretary's cross-motion, concluding that Ohio's absentee ballot system unconstitutionally discriminates between two similarly situated groups of confined Ohio voters in violation of equal protection. Opinion, R.70, PageID#4288. The court did not resolve Plaintiffs' undue burden claim. *Id.*, PageID#4322.[4]

Applying this Court's precedent in *Obama for America v. Husted*, 697 F.3d 423 (6th Cir. 2012), the district court weighed the burden on Plaintiffs' fundamental right to vote against the Secretary's justifications for the disparate treatment of late-hospitalized and the late-jailed voters. Opinion, R.70, PageID#4310-12. In so doing, the district court considered and rejected the arguments that the Secretary raises again on appeal.

---

[4] The Secretary acknowledges that the "District Court did not issue a final decision on this claim," Br. at 47, but nonetheless asks this Court to "remand with instructions to enter summary judgment" on the claim for him. This Court does not render judgment on a claims that were not decided below. *See Prime Media, Inc. v. City of Brentwood, Tenn.*, 398 F.3d 814, 825 (6th Cir. 2005) ("Because the district court did not address [this] claim[], we leave it to the district court in the first instance to consider [it]."). That is especially true when the Secretary seeks summary judgment from the Court of Appeals having presented only suppositions, rather than record evidence, in support of his theory of the case. *See* Fed. R. Civ. P. 56 (requiring proof of "no genuine dispute as to any material fact").

The Secretary argued that the magnitude of the burden should be defined not by the severity of the burden on Plaintiffs' voting rights, but by the burden the challenged law imposes on *all* Ohio voters generally. *Id.*, PageID#4312-13. The court correctly noted that, because Plaintiffs brought an as-applied challenge, the proper approach was to determine "how severely (if at all) the [general absentee ballot application] deadline burdens the voting rights of persons in the Class." *Id.*, PageID#4314.

The Secretary also argued that Class members should have foreseen their arrests and planned accordingly by voting early. *Id.*, PageID#4312-13. The court was unpersuaded, noting that "the Class are all persons who anticipated" being able to vote normally, but whose "inability to do so was due to State action—their arrest." *Id.*, PageID#4318-19 (noting "it is the State which is both physically preventing [Plaintiffs] from going to the polls and denying them alternative means of casting their ballots"). The court also noted that, "for those in the Class who cannot meet the deadline, no practicable alternative to vote remains." *Id.*, PageID#4318. Based on the arguments and evidence before it, the court determined that the burden faced by the Class was "between slight and severe." *Id.*, PageID#4319.

The Secretary offered two justifications for the burden imposed on the Class. First, he contended that the burden was slight. The district court rejected this "entirely circular" argument because "the severity of a burden is not itself a

justification for that burden." *Id.*, PageID#4321. Second, the Secretary argued that an interest in orderly election administration justifies the deadline. Although the court acknowledged the State's interest in a generally applicable absentee request deadline for election administration, it noted that the deadline at issue here is not generally applicable: it provides a different deadline for one of two categories of confined voters, and "such a justification is not responsive to the disparate treatment problem." *Id.*, PageID#4322.

The Secretary then offered two purported justifications for the disparate treatment of hospital-confined and jail-confined voters: first, that hospital-confined and jail-confined voters are not similarly situated when it comes to voting, and second, that "line drawing is necessary any time special accommodations are made for one class of voters." *Id.*, PageID#4322-23.

The district court rejected these justifications. The court noted that there was no record evidence to support the theory that hospital- and jail-confined voters were dissimilar for equal protection purposes, but instead the evidence showed that they were similar in all respects relevant to the appropriate deadline for requesting a ballot. *Id.*, PageID#4328-29. Likewise, the district court rejected the Secretary's contention that the State's bare interest in "line drawing" saved the law "because it neither provides a justification for treating similarly situated confined voters

differently under the law nor explains why the Class and hospital-confined voters are not similarly situated." *Id.*, PageID#4330.

Finally, the district court rejected the Secretary's contention that hospital-confined voters may be considered "particularly worthy" of accommodation. It concluded that "hospitalized persons *are not* more worthy of additional voting privileges under our Constitution than jail-confined persons" and that the Constitution prohibits doling out the right to vote "because the legislature values the former's votes over the latter's." *Id.*, PageID#4330-31.

The district court certified a class pursuant to Fed. R. Civ. P. 23(b)(2), rejecting the Secretary's arguments that the class was not necessary, not ascertainable, and did not satisfy the commonality or typicality requirements. *Id.*, PageID#4297-4308.

On December 19, 2019, the district court rejected the Secretary's motion for a stay pending appeal, explaining that the Secretary was "incorrect in arguing that the Court failed to address [his] argument" that administrative burdens justify the deadline as a general matter. Order, R.80, PageID#4369. The court also rejected the Secretary's "flip assertion" that Class members could just vote early because "no Class members can anticipate being arrested and detained through the election any more than one can plan an emergency hospitalization." *Id.*, PageID#4370.

## SUMMARY OF ARGUMENT

The district court's order granting summary judgment to Plaintiffs and certifying a class should be affirmed. The Secretary's arguments on appeal are divorced from the evidentiary record and contrary to binding Sixth Circuit precedent.

*First*, the district court properly concluded that Ohio's decision to provide late-hospitalized voters, but not late-jailed voters, access to absentee ballots violates the Equal Protection Clause. Plaintiffs offered substantial, unrebutted evidence that late-jailed voters have no mechanism to vote, and thus face a severe burden to their voting rights. The Secretary's proffered interest—the orderly administration of elections—is undeniably important. But the orderly administration of elections is not threatened or undermined by providing late-jailed voters with equal access to the ballot. Thus the State's proffered interests fail to justify this burden. To begin, his designated representative under Rule 30(b)(6) disclaimed awareness of any rationale justifying the unequal treatment, testifying it would be "complete speculation" on her part to offer one. This Court should not credit the Secretary's *post hoc* assertions now. Plaintiffs established with ample evidence that absentee voting for late-jailed voters is feasible and administrable. The only evidence the Secretary elicited to counter Plaintiffs' evidence of administrability was that some counties may need to hire a few additional temporary staff. The district court correctly deemed that insufficient reason to treat late-jailed voters differently and deny them the franchise.

Moreover, the Secretary's contention that late-hospitalized and late-jailed voters are differently situated is contradicted by the record. Throughout his brief, the Secretary makes bald assertions that jail-confined voters are harder to find than hospital-confined voters, that BOE staff are hampered by security concerns at jails but not at hospitals, and that jail-confined voters are more transient than hospital-confined voters. He cites *no evidence* to support these claims. Worse, the record expressly contradicts his assertions. The district court carefully applied this Court's precedent and concluded that the Secretary's proffered justification for denying late-jailed voters access to the ballot was unsupported by any record evidence and was insufficient to justify their unequal treatment compared to late-hospitalized voters.

*Second*, the district court did not abuse its discretion by granting a class under Rule 23(b)(2). The Class's claims are common and typical because a single legal question resolves them. Moreover, this Court's binding precedent forecloses the Secretary's ascertainability argument—an argument that is wrong in any event because, every election, BOEs face no difficulty ascertaining which jail-confined and hospital-confined voters can vote under § 3509.08's identical rule.

The district court's judgment and order certifying a class should be affirmed.

## ARGUMENT

### I.     Standard of Review

The district court's grant of summary judgment is reviewed de novo. *Franklin v. Kellogg Co.*, 619 F.3d 604, 610 (6th Cir. 2010). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To defeat a motion for summary judgment, "[t]he non-moving party may not rest upon its mere allegations or denials . . . but rather must set forth *specific facts* showing that there is a genuine issue for trial." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 390 (6th Cir. 2008) (emphasis added). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).[5]

---

[5] Notably, the Secretary does not ask this Court merely to overturn the district court's proper grant of summary judgment, but also to render judgment in his favor. The Secretary cannot meet the standard to reverse the district court's reasoned judgment below because his arguments rest on bald factual speculation lacking any evidentiary support. The Secretary certainly cannot meet the *much* higher burden of proving his factual theory—that serving late-jailed voters is more difficult and disruptive than serving late-hospitalized voters—beyond any material dispute.

II. **The District Court Correctly Concluded, Based Upon the Undisputed Record Evidence, that Ohio's Disparate Treatment of Jail-Confined and Hospital-Confined Voters Violates Equal Protection.**

The district court correctly concluded that settled principles of equal protection in the voting context—applied to the undisputed record evidence—establish that Ohio's differential treatment of late-jailed and late-hospitalized voters violates the Equal Protection Clause.

As the district court explained, "[v]oting is a fundamental and precious right and '[o]ther rights, even the most basic, are illusory if the right to vote is undermined.'" Opinion, R.70, PageID#4308 (quoting *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964)). Although states may "enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder," *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 585 (6th Cir. 2006) (internal quotation marks omitted), "lines [governing the right of suffrage] may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment." *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 665 (1966); *see also McDonald v. Bd. of Election Commr's of Chicago*, 394 U.S. 802, 807 (1969) ("[O]nce the States grant the franchise, they must not do so in a discriminatory manner." (citation omitted)); *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 477 (6th Cir. 2008) ("The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its

exercise.") (quotation marks omitted). For that reason, this Court affirmed that "[t]he Equal Protection Clause applies when a state either classifies voters in disparate ways, or places restrictions on the right to vote." *Obama for Am. v. Husted*, 697 F.3d 423, 439 (6th Cir. 2012) ("*OFA*") (citations omitted).

The nature of the burden determines the standard courts apply when assessing election regulations. "[S]trict scrutiny applies when a state's restriction imposes 'severe' burdens" on the right to vote. *Ne. Ohio Coal. for the Homeless v. Husted*, 698 F.3d 580, 592 (6th Cir. 2012). Where the right to vote is burdened, but not severely, courts apply the *Anderson-Burdick* standard. *See e.g.*, *OFA*, 697 F.3d at 430.

Under *Anderson-Burdick*, the court "must weigh the character and magnitude of the asserted injury to the rights protected . . . against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quotation marks omitted). "However slight [the] burden may appear . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (plurality op.) (citation omitted).

When a law not only places a burden on the right to vote but also discriminates between voters, the State must justify both the burden it has placed on the right to vote and the disparate treatment. *OFA*, 697 F.3d at 432. Importantly, mere administrative burdens will not suffice to justify such discriminatory restrictions. *See Carrington v. Rash*, 380 U.S. 89, 96 (1965) ("The right to choose that this Court has been so zealous to protect, means, at the least, that States may not casually deprive a class of individuals of the vote because of some remote administrative benefit to the State.") (citations omitted).

In *OFA*, which controls here, the plaintiffs facially challenged an Ohio statute, enacted in 2011, that limited in-person early voting to military voters during the last three days before an election; the prior law permitted any voter to cast an early vote on these days. 697 F.3d at 425-27. This Court affirmed the district court's preliminary injunction. With respect to the burden, this Court explained that the plaintiffs had offered proof that a significant number of Ohio voters would be precluded from voting without the additional days of in-person early voting. *Id.* at 431. "The State did not dispute the evidence presented by Plaintiffs, nor did it offer any evidence to contradict the district court's findings of fact." *Id.* This Court concluded that "[t]he burden on non-military Ohio voters is not severe, but neither is it slight." *Id.* at 433. The district court's decision here echoes that determination.

This Court also rejected as insufficient the State's proffered justifications, that (1) BOEs were too busy preparing for Election Day to offer all voters in-person early voting on the final three days and (2) military voters faced unique challenges that warranted differential treatment. *Id.* at 432. In so holding, the Court emphasized that when the State burdens the right to vote unequally, it "must propose an interest sufficiently weighty to justify the [discriminatory] limitation." *Id.* at 433 (quotation marks omitted).

Regarding the first justification, this Court acknowledged that "the staff and volunteers who prepare for and administer elections undoubtedly have much to accomplish during the final few days before the election," *id.* at 432-33, but found this explanation not "sufficiently important" in light of the absence of "specific evidence" that local boards would struggle to extend in-person early voting to all eligible voters. *Id.* at 433-34. This Court reasoned that if the law were generally applicable and nondiscriminatory, the proffered justification "would likely be sufficient." *Id.* at 434. But since the law was "not generally applicable to voters," the State's "vague interest in the smooth functioning of local boards of elections" could not "excuse the discriminatory burden it has placed on some but not all Ohio voters." *Id.*

This Court likewise rejected the State's second justification—that military voters faced unique challenges meriting their preferential treatment. In so doing, this

Court acknowledged that military voters are often not similarly situated to other voters. *Id.* at 435. However, "[w]ith respect to in-person early voting," the Court held "there is no relevant distinction between the two groups." *Id.* The mere possibility of a sudden deployment in the days before Election Day was insufficient to make the voters differently situated, given that many other voters face a similar risk of becoming unavailable on Election Day. *Id.* This Court concluded that there was no reason to provide other voters with fewer opportunities to cast ballots "particularly when there [was] no evidence" that local boards of elections would not be able to cope. *Id.* Cautioning that it would be "worrisome . . . if the states were permitted to pick and choose among groups of similarly situated voters to dole out special voting privileges," this Court held that the State's justification was insufficient and that the plaintiffs were likely to succeed on their equal protection claim. *Id.* at 435-36.

The reasoning in *OFA*, which closely parallels the arguments here, compels the conclusion that the district court was correct when it decided, based upon the undisputed record evidence, that the Secretary's proffered justifications for treating late-jailed and late-hospitalized voters unequally are insufficient to overcome the disparate burden imposed on late-jailed voters.

**A. Ohio's Denial of Absentee Voting in the Days Proceeding Election Day Imposes a Severe Burden As-Applied to Late-Jailed Voters.**

Ohio's refusal to offer absentee ballots to late-jailed voters, whose detention prevents them from voting on Election Day, imposes a severe burden—indeed constitutes an outright denial—on their right to vote. This Court has already acknowledged this burden: "[t]he practical outcome of the current procedure" is that late-jailed voters "who have not already voted using one of the other absent voter ballot procedures are *unable to vote*." *Fair Elections Ohio v. Husted*, 770 F.3d 456, 458 (6th Cir. 2014) (emphasis added). The Secretary does not dispute that late-jailed voters have no mechanism to cast a ballot if they are not released before close of polls on Election Day. *See* Seskes Deposition R.55-4, PageID#2180 (Secretary's corporate representative admitting this fact). Nevertheless, he contends that the burden is "minimal." Br. at 27. This is not so.

First, the Secretary says the burden is minimal because "[i]t affects *only* those voters" whose time of arrest prevents them from meeting the general request deadline. *Id*. But as the district court concluded, this makes no sense because Plaintiffs assert an as-applied challenge on behalf of *only* late-jailed voters, not a facial challenge on behalf of all Ohioans to the general absentee ballot deadline. Opinion, R.70, PageID#4313-14. As Judge Easterbrook of the Seventh Circuit explained in the context of as-applied challenges to voting laws, "[t]he right to vote

is personal and is not defeated by the fact that 99% of other people can secure the necessary credentials easily." *Frank v. Walker*, 819 F.3d 384, 386 (7th Cir. 2016).

Second, the Secretary contends that "anyone who fears winding up in jail on Election Day . . . may eliminate the risk by voting early." Br. at 27. But as the district court explained in denying the Secretary's request for a stay, this "flip assertion . . . misunderstands the fact that no Class member can anticipate being arrested and detained through the election" because "inability to foresee confinement" is a feature of the Class. Order, R.80, PageID#4370. Likewise, the district court noted that this argument "shows a remarkable disregard for the value of the votes of Class members—all of whom are presumed innocent even as they are deprived of their right to vote." *Id.*

Third, the Secretary contends that "being jailed on Election Day is presumably . . . a once-in-a-lifetime burden." Br. at 27. The Secretary cites no authority—nor could he—for the proposition that the State may deny an eligible voter the right to vote, so long as it does so just once.

Perhaps recognizing the absurdity of these arguments, the Secretary then contends that the burden is "at worst . . . somewhere between minimal and severe," or "moderate." Br. at 28. The district court reached this conclusion because "Class members had various other opportunities to vote prior to their arrest" and because some class members (*i.e.*, those arrested between Friday evening and noon Saturday)

"*theoretically* could still vote," although they do not "hav[e] unrestricted access to paper, pens, envelopes, stamps, the mail, etc." that they would need to do so. Opinion, R.70, PageID#4318 (emphasis added); *see also id.*, PageID#4289 (noting that Plaintiff Nelson, arrested on Friday, "did not have access to a stamp, envelope, or phone card prior to the deadline for submitting a request for an absentee ballot").

Although the district court is correct that the disparate treatment of late-jailed and late-hospitalized voters violates the Equal Protection Clause even if the burden is classified as "between slight and severe," *id.*, PageID#4319,[6] the burden is in fact "severe." The fact that someone *could* vote early prior to their arrest does not lessen the burden of an outright denial of the right to vote after the person is arrested. That is so because, as the district court itself explained, "no Class member can anticipate being arrested and detained through the election." Order, R.80, PageID#4370. The burden is heightened because, as the district court highlighted, their inability to vote is "due to State action." Opinion, R.70, PageID#4318; *see O'Brien v. Skinner*, 414 U.S. 524, 533 (1974) ("[I]t is the State which is both physically preventing appellants

---

[6] Indeed, the court likewise correctly noted that the Secretary's proffered justification would be insufficient even weighed against a minimal burden. Opinion, R.70, PageID#4331.

from going to the polls and denying them alternative means of casting their ballots.")
(Marshall, Douglas, Brennan, JJ., concurring).[7]

To illustrate why the burden is severe, imagine if, for cost-saving reasons, a county BOE announced on the Monday preceding Election Day that it was canceling in-person voting on Tuesday. No one would contend that the voters who were planning to vote on Election Day were not severely burdened simply because they could have voted early. To conclude otherwise would ask voters to be either lucky or prophetic, to act in anticipation of an event they cannot predict, in order to exercise their right to vote. But voters are entitled to await Election Day to vote—indeed most

---

[7] It is undeniable that the State bears the responsibility for ensuring the justified pretrial deprivation of liberty does not result in unjustified deprivations of other constitutionally protected rights. *See DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195–96 (1989) ("[I]t is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause."); *Bell v. Wolfish,* 441 U.S. 520, 535 (1979) ("[A] detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."); *Turner v. Safley,* 482 U.S. 78, 84 (1987) ("Prison walls do not form a barrier separating prison inmates from the protections of the Constitution.") (holding that the State must accommodate a prisoner's right to marry); *see also Youngberg v. Romeo*, 457 U.S. 307, 317 (1982) (recognizing the state cannot deprive plaintiff of constitutionally protected "interests that involuntary commitment proceedings do not extinguish"); *Robinson v. Jackson*, 615 Fed. Appx. 310, 314 (6th Cir. 2015) ("[Prisoners] have a constitutional right to be served meals that do not violate their sincerely-held religious beliefs.").

do[8]—and the State may not outright deny them that right simply because early voting was available. *See also Veasey v. Abbott*, 830 F.3d 216, 255-56 (5th Cir. 2016) (en banc) (explaining that mail-in voting "is not the equivalent of in-person voting for those who are able and want to vote in person" because, *inter alia*, "voters lose the ability to account for last-minute developments, like candidates dropping out of a primary race, or targeted mailers and other information disseminated right before the election").[9]

"The hallmark of a severe burden is exclusion or virtual exclusion from the ballot." *Libertarian Party of Kentucky v. Grimes*, 835 F.3d 570, 574 (6th Cir. 2016). In determining whether a burden is severe, the key consideration is whether there

---

[8] In November 2018, fewer than a third of voters cast ballots early. Ohio Sec'y of State, 2018 Official Election Results, https://www.sos.state.oh.us/elections/election-results-and-data/2018-official-elections-results/.

[9] The burden for the Class is no less severe because it includes some members (*i.e.*, those arrested between Friday evening and noon Saturday) who theoretically have a few hours to apply before the deadline. The record evidence demonstrates that this opportunity is purely theoretical. *See* Opinion, R.70, PageID#4319 (noting the "extraordinary efforts" it would require); Trowbridge Deposition, R.55-23, PageID#2576, 2601 (jail official testifying that inmates have no internet access and visitors are not allowed contact with inmates, which would be necessary to exchange an absentee ballot application); Nelson Deposition, R.55-10, PageID#2359, 2363-64 (Plaintiff Nelson testifying that there was no phone book or sign posted with BOE phone number, and he had no access to stamps, mail, or phone card until commissary was available the day after the 2018 election). The Secretary offered no contrary evidence.

are any available alternative means of access. *See Citizens for Legislative Choice v. Miller*, 144 F.3d 916, 921 (6th Cir. 1998); *see also Grimes*, 835 F.3d at 574. It is undisputed that late-jailed voters have no means of access to the ballot.[10] The appropriate test is therefore strict scrutiny. Nonetheless, the district court correctly concluded that the disparate treatment here violates the Equal Protection Clause even if characterized as less than severe.

### B. The District Court Correctly Concluded, Based on the Undisputed Record Evidence, that Election Administration Concerns Do Not Justify Denying Late-Jailed Voters Access to the Ballot.

The district court correctly rejected the Secretary's contention that election administration concerns justify denying late-jailed voters the same access to the ballot offered to late-hospitalized voters. The Court must consider the "precise interests" proffered by the Secretary, which must be "relevant," "legitimate," and "sufficiently weighty to justify" denying late-jailed voters access to the ballot. *Crawford*, 553 U.S. at 190-91 (plurality op.). A "remote administrative benefit to the State" cannot justify vote denial. *Carrington*, 380 U.S. at 96. In his briefing, the Secretary proffers the "orderly administration of elections" as a justification weighty

---

[10] This is not a case about the "micromanagement" of "policy questions," Br. at 4, 7, or the alleged frivolous nature of other election-law cases, *id.* at 1. Rather, it is a case brought by individual voters who, due to the State's restraint of their liberty, face certain disenfranchisement.

enough to warrant denying late-jailed voters access to the ballot. Br. at 28. The undisputed record proves otherwise.

To begin, the Secretary's invocation of the "orderly administration of elections" is a *post hoc* litigation rationalization, contradicted by the record evidence. When the Secretary's designated Rule 30(b)(6) representative was asked at her deposition "do you know what the rationale is for treating unforeseeably hospitalized voters different than unforeseeably jailed voters," she responded "[n]o." Seskes Deposition, R.55-4, PageID#2183. When asked "[c]an you think of a rationale for treating unforeseeably hospitalized voters differently than unforeseeably jailed voters," she responded "[i]t would be complete speculation. I'm not a legislator." *Id.*

These answers are binding on the Secretary. "To satisfy Rule 30(b)(6), the [organizational] deponent has an affirmative duty to make available [a person who] will be able to give complete, knowledgeable and binding answers on its behalf." *Reilly v. Natwest Markets Grp., Inc.*, 181 F.3d 253, 268 (2d Cir. 1999) (internal quotation marks omitted); *accord Ecclesiastes 9:10-11-12, Inc. v. LMC Holding Co.*, 497 F.3d 1135, 1146 (10th Cir. 2007). This rule applies with equal force to government agencies. *See, e.g.*, *Consumer Fin. Protection Bureau v. Borders & Borders, PLC*, No. 3:13-CV-1047-CRS, 2016 WL 9460471, at *5 (W.D. Ky. June 29, 2016). A "'we-don't-know' response can be binding on the [agency] and prohibit

it from offering evidence at trial on those points" or "effectively . . . chang[ing] its answer by introducing evidence at trial." *Id.* at *5 (internal quotation marks omitted).

The Secretary may not offer *post hoc* rationalizations on appeal that contradict his designated representative's sworn testimony. Seskes Deposition, R.55-4, PageID#2183. This is especially so in the context of an equal protection challenge involving voting rights, where this Court's review is heightened. *Cf. United States v. Virginia*, 518 U.S. 515, 533 (1996) ("The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation.").

But even if the Secretary were not bound by his representative's contrary testimony, the district court correctly concluded that the record evidence shows that the Secretary's proffered concerns about "orderly administration of elections" do not justify treating late-jailed voters worse than late-hospitalized voters.

First, the Secretary contends that the "orderly administration of elections" constitutes "a number of interrelated interests including preserving the integrity of the election process, maintaining a stable political system, preventing voter fraud, protecting public confidence, and reducing administrative costs." Br. at 28 (citations omitted). While the Secretary cites other cases that implicate these diverse interests, *see id.*, almost none is relevant here. Indeed, the Secretary makes no argument—and cites no record evidence—that providing late-jailed voters with a mechanism to vote would somehow impact any interest aside from administrative costs. *See* Br. at 40.

But as the district court concluded, "[t]he relatively small, solely pecuniary, burden" on BOEs is insufficient to justify denying late-jailed voters a mechanism to vote. Order, R.80, PageID#4371. Indeed, the only evidence the Secretary cites is two county officials' testimony that, had the injunction ordered by the district court in *Fair Elections Ohio* been implemented, they anticipated needing additional temporary staff to accommodate late-jailed voters, although neither could specify how many. Br. at 41. The Secretary simply cannot repackage what is, at most, a minimal administrative burden as a broad threat to the "orderly administration of elections" that justifies denying the right to vote.

The undisputed evidence in the record shows that equalizing treatment would cause minimal administrative impact. For example, the jail voting coordinator for Franklin County testified that the same two staff members who currently administer jail voting on Monday would do so on Election Day if jail-confined voters were treated equally to hospital-confined voters. Royer Deposition, R.55-7, PageID#2297, 2299. Moreover, testimony in the record shows that counties already have additional backup teams on hand on Election Day to address any unexpected contingencies. Smith Deposition, 55-15, PageID#2447. To the extent any county BOEs might need to hire additional temporary staff to conduct jail voting on Election Day, rather than before the election, the Secretary offers no evidence to suggest the district court was wrong to characterize the cost as "relatively small." Opinion, R.80,

PageID#4371. The district court correctly concluded that administrative cost was an insufficient justification to warrant denying late-jailed voters their right to vote.[11]

Second, the Secretary devotes seven pages of briefing to cataloguing the various tasks that election officials must complete to administer an election, from preparing absentee ballots and hiring poll workers to responding to candidate deaths and power outages. Br. at 30-37. In doing so, he contends that "[t]he State has a strong interest in easing this load—or, at least, not adding to it." Br. at 30. In all those pages, though, the Secretary cites no evidence that extending the ballot request deadline for this limited class of voters would directly or indirectly impact any of these other activities, nor any evidence of mistakes that have occurred because of jail or hospital voting. If any such evidence existed, the Secretary should have presented it in the district court. He did not.

Instead, the Secretary asks this Court to consider how "crazy busy" election time is and then jump to the conclusion that offering a mechanism for late-jailed voters to cast a ballot would somehow jeopardize election administration. Br. at 31. But the Court cannot credit this baseless assertion—contradicted by the record—as sufficient to justify denying one class of voters access to the franchise while granting

---

[11] Only where the burden on voting is minimal and nondiscriminatory has this Court found administrative costs to be a sufficient justification. *See, e.g.*, *Ne. Ohio Coal. for Homeless v. Husted*, 837 F.3d 612, 635 (6th Cir. 2016); *Lawrence v. Blackwell*, 430 F.3d 368, 375 (6th Cir. 2005).

it to a second, similarly situated class of voters. Instead, this Court must consider the "precise interests" advanced by the Secretary and "the extent to which those interests make it *necessary* to burden the plaintiff's rights." *OFA*, 697 F.3d at 433 (quoting *Burdick*, 504 U.S. at 434) (emphasis in original). The Secretary cannot point to any evidence that elections in which late-jailed voters are allowed to vote would be disorderly, and so he retreats to the naked assertion that "common sense" compels that conclusion. Br. at 41. It does not.

Moreover, this Court has previously rejected such evidence-free invocation of election administration. In *OFA*, the State contended that its "interest in smooth election administration" justified eliminating the last three days of in-person early voting for all but military voters. 697 F.3d at 433. This Court explained that the State had merely asserted that providing equal access to early-voting "*could* make it much more difficult for the boards of elections to prepare for Election Day." *Id.* at 434 (emphasis in original). That was insufficient:

> With no evidence that local boards of elections have struggled to cope with early voting in the past, no evidence that they may struggle to do so during the November 2012 election, and faced with several of those very local boards in opposition to its claims, the State has not shown that its regulatory interest in smooth election administration is "important," much less "sufficiently weighty" to justify the burden it has placed on nonmilitary Ohio voters.

*Id.*

That reasoning applies with even greater force here. BOEs already administer voting at jails, up to and including on the Monday before Election Day, in a way that excludes late-jailed voters. Royer Deposition, R. 55-7, PageID#2299. The record shows they are perfectly able to conduct jail voting now, *see, e.g.*, Royer Deposition, R.55-7, PageID#2286-87, 2291 (noting process has always worked and neither jail or BOE staff has indicated it is burdensome), and that they would continue to do so if late-jailed voters were offered the ability to request absentee ballots through Election Day, *see, e.g.*, Poland Deposition, R.55-16, PageID#2471 (testifying Hamilton County BOE would comply with requirement to provide ballots to late-jailed voters); Royer Deposition, R.55-7, PageID#2298-99. As Ms. Royer from Franklin County testified, if late-jailed voters were offered the same opportunities as late-hospitalized voters, the Board would simply shift the day when they deliver absentee ballots to the jail. *See supra* at 8.

Moreover, rather than requiring BOEs to devote numerous employees to facilitating three full days of early voting, as in *OFA*, here the amount of time spent administering jail voting would not change appreciably if at all. The number of jails that must be visited by a team will not change; rather, merely the *day* on which that work occurs would change. And like in *OFA*, here county officials have, in sworn testimony, rejected the premise of the arguments the Secretary advances in his brief without record support. *E.g.*, Royer Deposition, R.55-7, PageID#2286 (Q: "In your

35

time since 2012, did anyone at the jail ever indicate that it was a burden to have the Board of Elections come and have folks vote?" A: "No. We were always welcomed.").

The administrative burden at issue in *OFA* was far greater than it is here. If the orderly administration of elections was an insufficient justification in that facial challenge, then the far smaller—and potentially nonexistent—administrative burden in this as-applied challenge falls far short, as the district court concluded.

## C. The District Court Correctly Concluded that Late-Jailed and Late-Hospitalized Voters Are Similarly Situated.

The district court correctly concluded that late-jailed and late-hospitalized voters are similarly situated for purposes of an equal protection analysis. The Equal Protection Clause forbids "governmental decisionmakers from treating differently persons who are in all *relevant* respects alike." *OFA*, 697 F.3d at 435 (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)) (emphasis in original); *Loesel v. City of Frankenmuth*, 692 F.3d 452, 462 (6th Cir. 2012) (noting that "a court should not demand exact correlation, but should instead seek relevant similarity") (quotation marks omitted).[12] There are no relevant differences between late-jailed and late-hospitalized voters.

---

[12] The Secretary quotes *Fitzgerald v. Racing Ass'n*, 539 U.S. 103, 108 (2003) for the proposition that the State can treat "*somewhat* similar people differently . . . because any attempt to help one group of voters 'inevitably requires that some [other] persons

Ohio law recognizes as much. The confined voter statute recognizes two classes of eligible voters who, for every election (1) are housed in an identifiable and established number of institutions, (2) are physically unable to travel to the polls on Election Day, and (3) would find it difficult to timely receive and cast an absentee ballot by mail. Ohio Rev. Code § 3509.08. As the district court concluded, both late-jailed and late-hospitalized voters "expected to be able to vote in the remaining days leading up to Election Day or on Election Day itself, unforeseeably became confined, and must submit an absentee ballot in order to exercise their right to vote. Boards of Elections officials already have access to both groups of voters, and protocols already exist for voting both groups of voters." Opinion, R.70, PageID#4328-29.

The Secretary contends otherwise but cites no record evidence to support his assertions. In lieu of evidence, the Secretary instead offers this Court pages of "facts" that are nothing more than his mere say-so. *See* Br. at 27-30, 44-46; *see also, e.g.*, Opinion, R.70, PageID#4324 (noting that the Secretary "relies on common

---

who have an almost equally strong claim to favored treatment be placed on different sides of the line.'" Br. at 26 (emphasis in original). He contends this is appropriate "especially when no suspect class is at stake." *Id.* (citing *Nordlinger*, 505 U.S. at 10). But *Fitzgerald* was about "state tax rates," and the Court distinguished cases involving heightened scrutiny. *Id.* at 107. It is hornbook law, as *Nordlinger* recognized, that heightened scrutiny applies to classifications involving suspect classes *or* "the exercise of a fundamental right." 505 U.S. at 10. Contrary to the Secretary's suggestion, minor differences are insufficient to warrant unequal voting rights. *See Harper*, 383 U.S. at 670 (characterizing voting as a "fundamental right").

knowledge that jails and hospitals are distinctly different facilities") (internal quotation marks omitted).

That is not enough. "The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A.*, 12 F.3d 1382, 1389 (6th Cir. 1993) (internal quotation marks omitted). That evidence must "do more than show that there is some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 339-40 (6th Cir. 1993). Rather, the party opposing summary judgment "must present significant probative evidence . . . to defeat the motion for summary judgment." *Id.* at 340. Not only has the Secretary offered no probative evidence to prove his claim that late-hospitalized voters are materially differently situated than late-jailed voters, but the record evidence shows the opposite. And to the extent there are record-supported differences, they *favor* granting late-jailed voters access to the ballot.

### 1. The Record Does Not Support the Secretary's Accessibility Argument.

The record does not support the Secretary's contention that hospitalized voters are more accessible than jailed voters. In support of this claim, the Secretary notes that in Franklin County deputies bring inmates to the chapel to vote, and that in Butler County inmates are brought one at a time to a single location to vote, a process

38

that one official there characterized as difficult. Br. at 37.[13] Notwithstanding that both examples demonstrate that election officials *can and do* gain orderly access to jailed voters, the Secretary says that these examples "contrast[] sharply with the protocol in hospitals. To be sure, hospitals can be chaotic too, and patients may not be in their rooms when board employees arrive. But unlike jails, board employees can work with the patients and hospital staff to locate the voters." Br. at 38.

For that claim, the Secretary cites nothing, because there is nothing in the record to support his assertion that hospital staff is more helpful in locating voters than jail staff, or that hospital voting "contrasts sharply" from jail voting regarding accessibility. Indeed, the record reflects that jailed voters are *more* accessible to elections officials. When Sybil Saxon, the Franklin County jail official tasked with coordinating jail voting, was asked if Board of Election officials "*ever had any difficulties gaining access* to the jail in order to let the inmates vote," her answer was "[n]o." Saxon Deposition, R.55-22, PageID#2550 (emphasis added). Likewise, the Butler County Jail is able to provide access to the inmates whenever the BOE requests it. Trowbridge Deposition, R.55-23, PageID#2596 (Q: "What time of the

---

[13] That official does not actually manage voting at his facility; when shown emails at his deposition of the official who does, he commented on how "clever" it was that voting took place at routinely scheduled lockdown time, streamlining the process he had suggested was difficult. Fisher Deposition, R.55-27, PageID#2697, 2701-02. In any event, his observation is not relevant to *when* jail voting should occur nor does it distinguish jail voting from hospital voting. *See, e.g.*, Kelly Deposition, R.55-24, PageID#2616 ("I've heard horror stories [about hospital voting].").

day does the board of elections ordinary come to the jail to vote?" A: "That is usually dictated by them . . . ." Q: "And are there times when the jail would say that's not an appropriate time for you to come?" A: "No, we make arrangements for that.").

Moreover, jail officials bring the voters to the election officials, simplifying their task. Ms. Royer of Franklin County testified that "[w]hen you go to the jail, everyone is brought to one room for you," and agreed that "[g]iven that," and also the fact she must "travel the county" to access hospitalized voters, "the time it takes to vote the jail folks [is] substantially less than the amount of work and time that goes into voting the hospital folks." Royer Deposition, R.55-7, PageID#2289. Her supervisor, the Franklin County Manager of Absentee Voting, emphasized the difficulty of accessing hospitalized voters, noting that BOE staff at hospitals must "physically go to the room and vote that person and then transfer their vote back to us, and sometimes it will go into the wee hours in the morning." Kelly Deposition, R.55-24, PageID#2616. Ms. Royer agreed it "[p]robably" "takes 1/11th the amount of time" to complete jail voting as it does hospital voting. Royer Deposition, R.55-7, PageID#2299.

According to the testimony of the officials who actually conduct jail- and hospital voting, jail-confined voters are *easier* to access than hospital-confined voters because jail officials bring them to a single location. The Secretary's

conclusion that this makes the jail-confined voters inaccessible defies the very

"common sense" he asks this Court to rely upon in lieu of any evidence.

### 2. The Record Does Not Support the Secretary's Security Argument.

The record likewise does not support the Secretary's contention that security concerns at jails, as opposed to hospitals, make late-jailed voters differently situated than late-hospitalized voters. The Secretary notes that "[j]ail officials have an interest in keeping their facilities safe," and that some jails have BOE officials undergo background checks before entering and sometimes track the items the BOE officials bring in (*e.g.*, pens, folders, etc.). Br. at 38-39. The Secretary contends, citing no record evidence, that "[t]his monitoring takes time that board employees do not have on Election Day." *Id.* at 39. The record does not support the Secretary's argument.

First, as the district court concluded, "because election officials already undergo whatever background checks are necessary, and jails already deal with the security risks of bringing ballots into jails, these concerns are irrelevant to the *timing* issue that is at the heart of this case," Opinion, R.70, PageID#4327 (emphasis in original), and the Secretary "has not cited anything specific about the security concerns themselves that explains why the Boards of Election representatives could not still undergo the same procedures they already undergo and simply arrive with

the ballots at a later date," *id*. "Nor has [the Secretary] offered evidence concerning a single security incident during inmate-voting." *Id.*, PageID#4328.

Without citing any contrary evidence, the Secretary complains that the district court "assume[d], without any basis, that the board employees who receive background checks to deliver absentee ballots *before* Election Day will be available *on* Election Day." Br. at 45 (emphasis in original). But the district court did not *assume* that was so, the undisputed record evidence proved it was. *See* Royer Deposition, R.55-7, PageID#2299 (Q: "It's[] actually[] the case that they would only have to give [background clearances] to two people, right?" A: "Yes." Q: "And that is, in fact, the same two people currently that have them?" A: "Yes."). Moreover, the premise of the Secretary's objection is wrong—the evidence shows that BOEs would still conduct one jail-voting day, they would just move it to Election Day. *Id.*, PageID#2297 (agreeing that "[t]here wouldn't be any additional trips to the jail necessitated"). The Secretary cites no record evidence suggesting that, even if the BOEs decided to alter which employees conduct jail voting on Election Day, they would not plan in advance to ensure background checks were completed. That would make little sense, given the other planning BOE officials already do to facilitate voting.

Moreover, nothing in the record supports the Secretary's contention that changing the day of jail voting could increase security risks. Ms. Saxon of Franklin

County testified to the absence of security incidents. *See* Saxon Deposition, R.55-22, PageID#2550 (Q: "Have there been any security incidents during the voting process that you are aware of?" A: "No.").

Rather than cite any record evidence, the Secretary offers this: "Of added concern, in the midst of Election Day time pressure, savvy prisoners could abuse the system by making a large number of requests in hopes of distracting guards." Br. at 39. Courts do not "credit bald assertions, empty conclusions, rank conjecture, or vitriolic invective. . . . [G]enuine issues of material fact are not the stuff of an opposing party's dreams." *Pina v. Children's Place*, 740 F.3d 785, 795 (1st Cir. 2014) (internal quotation marks and citation omitted). Of course, existing opportunities for jail voting have never led to this imagined scenario and the Secretary offers no explanation why moving the process to a later date could "distract[] guards." This Court does not credit a state's conjecture of what "*could*" happen, unsupported by evidence, if election restrictions are lifted. *OFA*, 697 F.3d at 434.

Finally, although the premise of the Secretary's argument is that jails have greater security concerns than hospitals, he elicited no evidence about hospital security whatsoever, nor does he offer even speculation in his brief as to the security situation at hospitals. Br. at 38-39, 44. If the Secretary had attempted to prove this

point in the district court, he almost certainly would have failed.[14] In any event, the Secretary's conjecture of supposed differences is not competent record evidence.

### 3. The Record Does Not Support the Secretary's Transience Concerns.

The district court correctly rejected the Secretary's contention that jail-confined voters are more "transient" than hospital-confined voters. Br. at 39-40, 44. The court reasoned that "[j]ust as jail-confined voted may be in court or at a doctor's appointment when the Board of Elections official attempts to deliver the ballot, a hospital-confined voter may be in an x-ray room, having other tests run, or be in the middle of a discussion with the doctor. And if the voter is confined due to his or her minor child's condition, the voter may even be in the hospital cafeteria or another area of the hospital entirely." Opinion, R.70, PageID#4325.

Although the Secretary notes that on Election Day jail-confined voters may be at their initial appearances,[15] or at "a medical facility, a psychiatric facility, or get released from jail," Br. at 39, he offers no explanation for how this makes them

---

[14] *See, e.g.*, Ben Sutherly, *Hospital Access, Security Is a Real Balancing Act*, The Columbus Dispatch (Aug. 13, 2012), https://www.dispatch.com/article/20120813/news/308139829 (survey of Ohio hospitals that have metal detectors, security wands of visitors, and limited entry by security cards to various wings and categories of patients).

[15] Those appearances would presumably occur during business hours, and there is no reason jail voting would not occur after those hours (as it does for hospital voting), particularly given the 3 p.m. deadline for requests.

differently situated than hospital-confined voters. Indeed, an inmate who is in jail and brought to a "medical facility" or "psychiatric facility" for treatment on Election Day might even be able to vote under the existing system, given their admission into a hospital. *See* Ohio Rev. Code § 3509.08(B). The admission and release of jail-confined voters is under the complete control of the State, and is meticulously managed and documented by State officials. The Secretary cannot seriously contend that this population is more "transient" than hospitalized voters, who can be discharged by any number of personnel and who can walk out of the hospital without permission or notice if they wish.

With no citation to the record, the Secretary posits that "while a hospitalized voter might *sometimes* be hard to find, jailed voters are *often* hard to find because of their transient nature." Br. at 44 (emphasis in original). No witness said this. No evidence suggests this. Quite the opposite:

> Q.   Are you aware of any instance in which an inmate who was scheduled to vote couldn't be found?
> A.   No.

Saxon Deposition, R.55-22, PageID#2550 (emphasis added). The voting records reflect this. In Franklin County, from 2014 through 2018, only *two* of the thirty (7%) jail-confined voters who requested ballots had left the jail by the time the BOE arrived with ballots and thus did not complete ballots. Voting Report, R.57-1, PageID#3363; Royer Deposition, R.55-7, PageID#2293-94. By contrast, in just the

45

November 2018 election, four of the eighteen (22%) hospital-confined voters in Hamilton County were unable to cast ballots. Poland Deposition, R.55-16, PageID#2476. Sherry Poland, the Hamilton County BOE Director, testified that this was so for a number of reasons: "It could have been that the voter was in surgery at the time our team was there. They may have been released from the hospital but for whatever reason they were unable to vote." *Id.* PageID#2476.

The Secretary cannot rely on "facts" conceived of *post hoc* and directly contradicted by the record.[16] The district court correctly concluded that that jail-confined and hospital-confined voters are similarly situated in all relevant respects.

### D. The District Court Correctly Concluded that the Differing Treatment of Late-Jailed Voters Is Unconstitutional.

As the district court concluded, applying the *Anderson-Burdick* balancing test, Ohio's denial of equal treatment to late-jailed voters is unconstitutional. The Secretary agrees that late-jailed voters have a fundamental right to vote but no mechanism to cast a ballot, Seskes Deposition, R.55-4, PageID#2180, and his designated representative could not articulate a justification for treating late-jailed and late-hospitalized voters differently, *id.*, PageID#2183.

---

[16] For obvious reasons, the record does not cover every county, but the Secretary proffered no evidence to rebut that offered by Plaintiffs. *See OFA*, 697 F.3d at 433 ("While these counties cannot speak for all of Ohio's counties, the State introduced no specific evidence to refute any of their assertions, nor has it suggested that the experience of these counties is unique.").

The Secretary's effort to compare late-jailed voters to those with "car trouble, a towed car, a family death, a flooded basement, or something else" fails. Br. at 42. "[E]lection regulations need not account for all of life's vagaries." Opinion, R.70, PageID#4329. But for late-jailed voters, life is not getting in the way—*the State is.*[17] "[I]t is the State which is both physically preventing appellants from going to the polls and denying them alternative means of casting their ballots." *O'Brien*, 414 U.S. at 533 (Marshall, J., concurring).

Moreover, the Secretary's objection that the district court "[i]n a footnote . . . brushed aside any in-depth review of other States' laws" is curious, given that the Secretary brushed aside any such "in-depth review" as well. *See* Defendant's Summary Judgment Opposition, R.64, PageID#4165 (providing a string cite, without parentheticals, to other state laws); *McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort to developed argumentation, are deemed waived." (quotation marks omitted) (alterations in original)); *United States v. Batista*, 558 Fed. App'x 874, 877

---

[17] The Secretary wrongly contends that the same is true for state employees working late, a "driver racing to the polls . . . [who is] pulled over for a ticket," and a driver "miss[ing] her chance to vote if an improperly repaired pothole causes her to crash on State Route 315." Br. at 48-49. It is illegal in Ohio for an employer to prevent employees from voting. Ohio Rev. Code § 3599.06. A driver who can only reach the polls by "racing" has missed voting by leaving home too late, not because of state action (and is nothing like a voter arrested prior to 3 p.m. on Election Day). Br. at 48. And the implication of state action in potholes theoretically preventing voting is so far attenuated as to be unhelpful.

(11th Cir. 2014) (holding that a "string cite" "without providing any analysis" was a "cursory argument" that need not be addressed).

As the district court explained, "the parties have not provided full context for those laws," which the court noted had not been judicially reviewed. Opinion, R.70, PageID#4330 n.22. Those states may have other laws, regulations, or practices that permit late-jailed voters to cast a ballot. *Id.* Indeed, Plaintiffs cited a host of other states' laws that do offer late-jailed voters access to the ballot. *See* Plaintiffs' Opposition to Defendant's Motion for Summary Judgment, R.65, PageID#4174-75.

The Secretary also appeals to "line drawing," but lines must be drawn in constitutional places. The legislature has no right to draw a line between jail-confined and hospital-confined voters because of "the Ohio legislature's potential determination that such a group is 'particularly worthy' and therefore entitled to greater access to the ballot than those in the Class." Opinion, R.70, PageID#4330 (citation omitted).

Finally, the sole relief sought by the Secretary, that "the Court should remand with instructions to award the Secretary summary judgment," Br. at 22, makes no sense. The Secretary's entire argument on appeal is a presentation of disputed facts—albeit invented ones—related to his justifications and the alleged differences between jail-confined and hospital-confined voters. Even if this Court thought the Secretary had raised fact issues that precluded summary judgment for Plaintiffs, the

proper course would be to remand for trial, not grant the Secretary summary judgment as a matter of law. *See Loesel*, 692 F.3d at 452 ("[D]etermining whether individuals are similarly situated is generally a factual issue for the [trier-of-fact]."). That is not necessary here. The Secretary had every opportunity to elicit facts to support his arguments before the district court. He did not do so.

### III. The District Court Did Not Abuse its Discretion by Certifying a Class.

The district court did not abuse its discretion by certifying a class pursuant to Fed. R. Civ. P. 23(b)(2). "A district court has broad discretion to decide whether to certify a class." *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838, 850 (6th Cir. 2013). The district court's decision is "subject to a very limited review and will be reversed only upon a strong showing that the district court's decision was a clear abuse of discretion." *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 560 (6th Cir. 2007); *see also Davis v. Cintas Corp.*, 717 F.3d 476, 484 (6th Cir. 2013) (discussing the "narrow" scope of appellate review of class certification decisions). "An abuse of discretion occurs 'when the district court relies on erroneous findings of fact, applies the wrong legal standard, misapplies the correct legal standard when reaching a conclusion, or makes a clear error of judgment.'" *Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Michigan*, 654 F.3d 618, 629 (6th Cir. 2011) (citing *Reeb v. Ohio Dep't of Rehab. & Corr.*, 435 F.3d 639, 644 (6th Cir. 2006)). Moreover, this Court has held that in "civil rights

cases," Rule 23 "should not be so strictly applied that the policies underlying class actions would be undermined." *Weathers v. Peters Realty Corp.*, 499 F.2d 1197, 1200 (6th Cir. 1974).

### A. The District Court Did Not Abuse its Discretion by Concluding that Plaintiffs Satisfied the Commonality and Typicality Requirements.

The district court correctly concluded that Plaintiffs satisfied the commonality and typicality requirements. "[F]or purposes of Rule 23(a)(2), [e]ven a single [common] question will do." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011) (internal quotation marks omitted; first bracket added); *see also Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998) (en banc) (same). And "the premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class." *Sprague*, 133 F.3d at 399.

Here, the district court identified one primary common question: "whether the Proposed Class is entitled to be treated equally with similarly-situated hospital-confined voters for purposes of submitting an absentee ballot application." Opinion, R.70, PageID#4304. And the court properly rejected the Secretary's contention that factual issues precluded certification, noting that even if some do exist, "none of them negate the Court's ability to resolve the overarching issue with respect to the Proposed Class as a whole." *Id*.

The Secretary contends that commonality and typicality are destroyed because of (1) "expectedly" jail-confined voters and (2) voters confined before noon on the

50

Saturday before an election, who are allegedly less burdened by the statute than other class members. Br. at 53-54. Neither argument has merit. First, the Secretary identifies individuals who voluntarily present themselves in response to a summons as expectedly jailed Class members. Br. at 53. These individuals are not members of the Class, which extends only to those "arrested" in the days leading up to Election Day. *See supra* at 11. Moreover, as the district court concluded, the common question is whether late-jailed voters are entitled to be treated equally to late-hospitalized voters. Opinion, R.70, PageID#4304. Late-hospitalized voters complete an application that requires them to affirm they were unexpectedly hospitalized. Hospital-Confined Emergency Application, R.55-8, PageID#2314. As the district court noted, the Secretary may devise a similar form here, with the same requirement. Opinion, R.70, PageID#4304-05. Indeed, the Secretary already did so back in 2014. Application, R.55-29, PageID#2740 (requiring jail-confined voter to affirm "unforeseeable arrest").

The Secretary's objection to including those jailed between Friday evening and Saturday noon, Br. at 54-55, is also without merit. Plaintiffs presented substantial evidence that voters jailed on Friday evening cannot feasibly deliver an absentee ballot before the deadline, and one of the class representatives was in precisely this situation. *See supra* at 10. The Secretary provided no evidence to the contrary. Moreover, as the district court concluded, *even if* those Class members

"theoretically could still vote," Opinion, R.70, PageID#4318, the record evidence shows that to do so "will likely require extraordinary efforts—efforts Class members must make during their first hours of incarceration and at the expense of focusing on their legal case or addressing other urgent needs in light of their arrest," *id.*, PageID#4319. Because of the burden these voters face—one the district court found outweighs the Secretary's justification—there are no individual fact issues sufficient to defeat certification.

The Secretary objects that the district court misunderstood the commonality and typicality analysis because those analyses must focus on "claims." Br. at 55-56. But the district court did focus on claims—it correctly concluded that the equal protection *claim* was about equal treatment to hospital-confined voters. Opinion, R.70, PageID#4304. Hospital-confined voters are offered a form that requires an affirmation of unexpected hospitalization. Those who foresee their hospitalization will read the application, and determine they are ineligible. The same should be true for those expectedly jailed. Plaintiffs' equal protection claim asks only that late-jailed voters be treated equally.[18]

---

[18] The Secretary is wrong to contend that "the certified class does not even allow for this sort of back-end screening process." Br. at 56. As the Secretary notes, the court's remedy requires "the same 3 p.m. 'deadline.'" *Id.* That is the deadline to *submit an application*—which may contain the affirmation.

The entire voter registration system is built on affirmations of eligibility, and the Secretary accepts hospital-confined voters' affirmation as sufficient evidence without interrogating them about whether they anticipated their admission or had symptoms that should have alerted them to a potential hospitalization. Poland Deposition, R.55-16, PageID#2472 (testifying that Hamilton County BOE does nothing to investigate and accepts sworn statement of unforeseen hospitalization); Royer Deposition, R.55-7, PageID#2286 (agreeing that officials "do not seek to verify whether or not they could have foreseen their hospitalization"). The Constitution merely requires late-jailed voters be treated equally.

### B. The District Court's Rejection of the Secretary's Ascertainability Objection Was Not an Abuse of Discretion.

The district court did not abuse its discretion by rejecting the Secretary's contention that BOEs cannot know at 3 p.m. on Election Day who "will remain" in custody for the remaining 4.5 hours the polls are open. Opinion, R.70, PageID#4306. This Secretary's argument is both wrong and trivial.

*First*, this Court held that Rule 23(b)(2) classes have no ascertainability requirement in *Cole v. City of Memphis*, 839 F.3d 530, 541-42 (6th Cir. 2016), and it did not differentiate between negative and affirmation injunctions, Br. at 58.

*Second*, the district court was right to find that election officials have no problem navigating this precise issue under the current system of jail-confined and hospital-confined voting. Opinion, R.70, PageID#4307-08. The Secretary says this

does not matter because that is by operation of law, not Rule 23. Br. at 58. But even where it applies, the ascertainability requirement's purpose is to ensure that it is "administratively feasible" for Class members to be identified. *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 537–38 (6th Cir. 2012). There is no better evidence of the feasibility of these determinations than the fact that the BOEs already make them without difficulty.

*Third*, even if this Court finds this aspect of the class definition problematic, the proper remedy is to eliminate the clause at issue. *See Powers v. Hamilton Cty. Public Defender Comm'n*, 501 F.3d 592, 618 (6th Cir. 2007) (modifying class definition on appeal). Plaintiffs suggested this as an alternative in their reply brief below. Class Reply, R.38, PageID#392. Doing so would put late-jailed voters on even footing with late-hospitalized voters, who are not required to show they will remain hospitalized until the polls close. *See* Ohio Rev. Code § 3509.08. And it would eliminate any grounds for the Secretary's objection. The fact that it would do so while changing nothing about how the BOEs would deliver absentee ballots illustrates the triviality of the Secretary's objection.

The district court did not abuse its discretion by certifying the class.

\*\*\*

Late-jailed Ohio voters—many of whom are in custody only because they cannot afford bail and are presumed innocent—are foreclosed from exercising their

right to vote. The Secretary casually dismisses this as a "minimal" burden justified by the orderly administration of elections. It is not. Ohio law creates an unjustifiable distinction between the two classes of confined voters that Ohio has chosen to recognize. The Secretary cannot save the law through *post hoc* rationalization and appellate-brief fact-finding while ignoring the evidence actually in the record that contradicts his assertions. The district court conscientiously applied the law to the facts, carefully following this Court's settled precedent. Its decision should be affirmed.

## CONCLUSION

For the foregoing reasons, the district court's judgment and order granting class certification should be affirmed.

January 31, 2020

Naila S. Awan
Kathryn C. Sadasivan
DĒMOS
80 Broad St., 4th Fl.
New York, NY 10004
(212) 485-6065
nawan@demos.org


Chiraag Bains
DĒMOS
740 6th St. NW, 2nd Fl.
Washington, DC 20001
(202) 864-2746
cbains@demos.org

Respectfully submitted,

/s/ Mark P. Gaber
Mark P. Gaber
Danielle M. Lang
Jonathan M. Diaz
Dana Paikowsky
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Ste. 400
Washington, DC 20005
(202) 736-2200
mgaber@campaignlegal.org

Jonathan Manes
RODERICK AND SOLANGE
   MACARTHUR JUSTICE CENTER
160 E. Grand Ave., 6th Fl.
Chicago, IL 60611
(312) 503-0012
jonathan.manes@law.northwestern.edu

*Attorneys for Plaintiffs-Appellees*

**CERTIFICATE OF COMPLIANCE**

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 23(a)(7)(B) and 6th Cir. R. 32(b) because it contains 12,948 words, as determined by the word-count function of Microsoft Word, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

/s/ Mark P. Gaber
Mark P. Gaber

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF SERVICE

I certify that on January 31, 2020, an electronic copy of the foregoing Brief was filed with the Clerk of Court for the U.S. Court of Appeals for the Sixth Circuit, using the appellate CM/ECF system. I further certify that all parties in this case are represented by lead counsel who are registered CM/ECF users, and that service will be accomplished by the appellate CM/ECF system.

/s/ Mark P. Gaber
Mark P. Gaber

*Counsel for Plaintiffs-Appellees*

# DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

Appellees designate the following documents from the district court's electronic record as required by Sixth Circuit Rule 30(g).

| Date Filed | Document Description | R.No.; PageID# |
|---|---|---|
| 11/06/2018 | Complaint | R.1; PageID#11 |
| 11/06/2018 | Motion for Class Certification | R.2-2; PageID#31 |
| 11/06/2018 | Emergency TRO Motion | R.3; PageID#105–06 |
| 11/06/2018 | Declaration of Tommy Ray Mays, II | R.3-1; PageID#123 |
| 11/06/2018 | Declaration of Quinton Nelson, Sr. | R.3-2; PageID#124 |
| 11/06/2018 | Declaration of Jonathan Diaz | R.3-3; PageID#126 |
| 11/06/2018 | TRO Order | R.12; PageID#153 |
| 12/10/2018 | TRO Hearing Transcript | R.20; PageID#174 |
| 5/31/2019 | Plaintiffs' Class Reply Brief | R.38; PageID#392 |
| 7/22/2019 | Deposition of Brandi Seskes | R.55-4; PageID#2180, 2183, 2186 |
| 7/22/2019 | Deposition of Shirley Royer | R.55-7; PageID#2280, 2282, 2286–89, 2291, 2293–99 |
| 7/22/2019 | Hospital-Confined Voter Emergency Ballot Application | R.55-8; PageID#2314 |
| 7/22/2019 | Deposition of Tommy Ray Mays, II | R.55-9; PageID#2319, 2321–22, 2329–30 |
| 7/22/2019 | Deposition of Mickey Smith | R.55-15; PageID#2441–42, 2447, 2452 |
| 7/22/2019 | Deposition of Sherry Poland | R.55-16; PageID#2465–66, 2469–72, 2476 |
| 7/22/2019 | Deposition of Quinton Nelson, Sr. | R.55-10; PageID#2356–57, 2359, 2363–64 |
| 7/22/2019 | Deposition of Bryan Cavender | R.55-12; PageID#2410 |
| 7/22/2019 | Deposition of Sybil Saxon | R.55-22; PageID#2549–50 |

| Date Filed | Document Description | R.No.; PageID# |
|---|---|---|
| 7/22/2019 | Deposition of Matthew Kelly | R.55-24; PageID#2616 |
| 7/22/2019 | Deposition of Carl Trowbridge | R.55-23; PageID#2576, 2596, 2601 |
| 7/22/2019 | Deposition of Nick Fisher | R.55-27; PageID#2697, 2701–02 |
| 7/22/2019 | 2014 Application Form | R.55-29, PageID#2740 |
| 7/26/2019 | Voting Report | R.57-1; PageID#3363 |
| 8/16/2019 | Defendant's Opposition to Plaintiffs' Motion for Summary Judgment | R.64; PageID#4165 |
| 8/16/2019 | Plaintiffs' Opposition to Defendant's Motion for Summary Judgment | R.65; PageID#4174–75 |
| 11/06/2019 | Opinion and Order | R.70; PageID#4288–89, 4297–308, 4310–14, 4318–19, 4321–31 |
| 12/19/2019 | Order Denying Defendant's Motion to Stay | R.80; PageID#4367, 4369–71 |